UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SCHEURER HOSPITAL,

        Plaintiff,

                                          Case No. 12-11536

v.                                             Honorable Thomas L. Ludington

LANCASTER POLLARD & CO. et al.,

        Defendants.

_____ /

**OPINION AND ORDER DENYING MOTION TO DISMISS
COMPLAINT AND GRANTING IN PART AND DENYING
IN PART MOTION TO DISMISS CROSS-CLAIM**

In law, as in history, it is often useful to begin by asking "For whose benefit?"  This is such a case.  In 2001, Plaintiff Scheurer Hospital retained a financial services firm, Defendant Lancaster Pollard & Co., to advise Plaintiff on a bond issuance.  To hedge against the risk of rising interest rates, Lancaster Pollard recommended that Plaintiff enter into an interest rate swap agreement with a third-party financial institution, Lehman Brothers.  Plaintiff did so.  After Lehman sought bankruptcy protection in 2008, Plaintiff consulted Lancaster Pollard regarding the proper manner of terminating the agreement with Lehman.  Lancaster Pollard, in turn, retained a law firm, Defendant Peck Shaffer & Williams, to offer legal advice on how to terminate the agreement.  Peck Shaffer did so, giving the advice to Lancaster Pollard, who forwarded the instructions to Plaintiff.  The instructions (allegedly) proved incorrect, however, rendering Plaintiff's termination of the swap agreement ineffective.  Consequently, Plaintiff had to compensate Lehman.  This litigation ensued.

Plaintiff brought suit against Defendants seeking compensation for the damages caused by the allegedly incorrect advice.  Lancaster Pollard, in turn, cross-claimed against Peck Shaffer.  Peck Shaffer now moves to dismiss both the complaint and the cross-claim for failure to state claims on which relief can be granted and for lack of personal jurisdiction.  ECF Nos. 5, 6.

The principal question presented in the motion to dismiss the complaint is whether, accepting the allegations in the complaint as true, Plaintiff was a third-party beneficiary of the attorney-client relationship between Lancaster Pollard and Peck Shaffer.  For reasons detailed below, the Court answers this question in the affirmative.  Briefly, Plaintiff was a third-party beneficiary because Peck Shaffer is alleged to have offered its services to Lancaster Pollard for the specific purpose of advising on Plaintiff's legal question, and, moreover, produced the legal advice for the direct benefit of Plaintiff.

The principal question presented in the motion to dismiss the cross-claim is whether Lancaster Pollard is asserting a derivative claim for indemnification rather than an independent action for legal malpractice.  Again, the Court answers this question in the affirmative.  The only damage alleged in the cross-claim is the risk of being held liable to Plaintiff for Peck Shaffer's incorrect advice.  Accepting the allegations in the cross-claim as true, Lancaster Pollard may be entitled to indemnification for liability arising from Plaintiff's professional negligence claim.  Lancaster Pollard is not, however, entitled to indemnification for liability arising from Plaintiff's claims for breach of contract, breach of fiduciary duty, and punitive damages.

Accordingly, the motion to dismiss the complaint will be denied.  The motion to dismiss the cross-claim will be granted in part and denied in part.

# I

## A

Plaintiff Scheurer Hospital is a Michigan not-for-profit corporation that operates a hospital serving the residents of Huron County, Michigan, and the surrounding areas.  Compl. ¶ 1.  Defendant Lancaster Pollard & Co. is an Ohio corporation specializing in providing financial services to health care providers such as Plaintiff.  *Id*. ¶¶ 3, 5.  Defendant Tanya Hahn was the managing director of Lancaster Pollard responsible for handling Plaintiff's account.  *Id*. ¶ 4.  (Collectively, Lancaster Pollard and Ms. Hahn are referred to as the "Financial Defendants").  Defendant Peck Shaffer & Williams, LLP, is a law firm headquartered in Ohio that specializes in healthcare financing.  *Id*. ¶ 7.  Defendant Jason George was the partner at Peck Shaffer responsible for providing advice regarding the transaction at issue to the Financial Defendants and, by extension, Plaintiff.  *Id*. ¶ 6.  (Collectively, Peck Shaffer and Mr. George are referred to as the "Legal Defendants").

Because the Legal Defendants move to dismiss the complaint and cross-claim pursuant to Federal Rule of Civil Procedure 12(b)(6), in evaluating whether Plaintiff and the Financial Defendants have stated claims on which relief may be granted the following facts from the complaint and cross-claim are assumed to be true.

## B

In 2001, Plaintiff sought to finance capital improvements and refinance existing debts by issuing $10 million in tax-exempt bonds.  Compl. ¶ 13.  The Financial Defendants offered to advise on the matter and underwrite the bonds.  *Id*. ¶¶ 13–14.  Plaintiff accepted.  *Id*. ¶ 14.

To manage some of the risk associated with the bond issuance, the Financial Defendants recommended that Plaintiff enter into an interest rate swap agreement with a third-party financial

institution.  *Id*. ¶¶ 15–16.  Designed to hedge against the risk of rising interest rates, the swap

agreement identified two rates: a floating rate and a fixed rate.  *Id*. ¶ 16.  The floating rate would

vary with the London Inter-Bank Offered Rate ("LIBOR").  *Id*.  The fixed rate (as its name

suggests) is a fixed rate established by the agreement.  *Id*.  When the LIBOR fell below the fixed

rate, Plaintiff would be required to make payments to the counterparty to the swap agreement.

*Id*.  When the LIBOR rose above the fixed rate, the counterparty would be required to make

payments to Plaintiff.  *Id*.  (Thus, Plaintiff would assume the risk of falling interest rates, but

would be protected from rising interest rates.)  Plaintiff agreed to implement the hedge.  *Id*. ¶ 15.

Accordingly, in October 2001 the Financial Defendants brokered a swap agreement on

Plaintiff's behalf of with Lehman Brothers Special Financing, Inc.  *Id*. ¶ 17.  On October 25,

2001, Plaintiff and Lehman executed the swap agreement.  *Id*.  The fixed rate was set at 3.87

percent.  ISDA Master Agreement Ex. C ("Swap Agreement"), *attached as* Compl. Ex. A.  The

term of the swap agreement was from November 2001 through November 2008.  *Id*.

Four sections of the swap agreement are particularly pertinent to the present controversy.

Section 5 provides that either party's bankruptcy constitutes an "Event of Default."  Swap

Agreement § 5(a)(vii).  Section 6 provides that if one party defaults, the other party may invoke

"an Early Termination Date in respect of all outstanding Transactions" via notice to the

defaulting party.  *Id*. § 6(a).  Section 10 provides the acceptable ways that notice may be

transmitted, specifying:  "Any notice or other communication in respect of this Agreement may

be given in any manner set forth below (except that a notice or other communication under

Section 5 or 6 may not be given by facsimile transmission or electronic messaging system)."  *Id*.

§ 10(a).  Finally, § 11 provides the parties' choice-of-law, specifying that the agreement will be

"governed by and construed in accordance with the law specified in the Schedule," *id*. § 11(a),

which (evidently[1]) selects "the laws of the state of New York, without reference to choice of law doctrine." *See* Swap Agreement Ex. B.

<strong>C</strong>

Lehman Brothers Holdings filed for Chapter 11 bankruptcy in the Federal Bankruptcy Court for the Southern District of New York on September 15, 2008. Compl. ¶ 20. About two weeks later, Lehman Brothers Special Financing (the counterparty to Plaintiff's swap agreement) filed for Chapter 11 bankruptcy. *Id.*

On September 30, 2008, the Financial Defendants contacted Plaintiff regarding Lehman's Chapter 11 filing. *Id.* ¶ 22. To address the issue, the Financial Defendants attached a proposed letter from Plaintiff to Lehman. *Id.* ¶ 24. The letter notified Lehman that because of its Chapter 11 filing Plaintiff was withholding future payments due under the agreement. *Id.* ¶ 24. The Financial Defendants advised Plaintiff to "sign and fax to Lehman Brothers as soon as possible regarding putting them on notice of the default and the nonpayment of your October 1 payment." *Id.* ¶ 22 (brackets omitted).[2] Plaintiff did so. *Id.* ¶ 23.

On October 9, 2008, the Financial Defendants requested that Plaintiff authorize the termination of the swap agreement. Compl. ¶ 25. Plaintiff did so. *Id.* The following week, Plaintiff received "a second letter to be addressed to Lehman on [Plaintiff's] letterhead. The second letter was drafted by Lancaster Pollard or [Mr.] George and/or Peck Shaffer for the

---

[1] As the Legal Defendants observe, the schedule attached to the complaint as an exhibit appears to be incomplete. Nevertheless, it is reasonable to infer that the agreement selects New York law. Exhibit B to the attached schedule — the guarantee of Lehmann Brothers — selects New York law. It is improbable that the swap agreement guarantee would select New York law, while the swap agreement itself would select another state's law. Moreover, Plaintiff does not contest the Legal Defendants' contention that the swap agreement selects New York law.

[2] Although not discussed in the complaint, October 2008 was also the final month of the original seven year term of the swap agreement. *See* Swap Agreement Ex. C.

purpose of terminating the bond interest rate swap agreement.  Again, [Plaintiff] was instructed to send the communication by facsimile." *Id.* ¶ 26.  Again, Plaintiff did so.  *Id.*

A short time later, the Financial Defendants "provided a third letter to [Plaintiff]." *Id.* ¶ 27.  This letter informed Lehman that, using the swap agreement's applicable valuation methods, the agreement's termination value was $0.  *Id.*  "Again, [Plaintiff] was instructed to send the communication by facsimile to Lehman and did so." *Id.*

Plaintiff then paid the Financial Defendants $2,000 "for the services provided by [Mr.] George to Lancaster Pollard related to the termination of the Swap Agreement, including an invoiced amount for 'legal fees.'" *Id.* ¶ 95.

### D

A little less than a year passed.  During this time, the Financial Defendants brokered a second bond interest rate swap agreement for Plaintiff, this time with RBS Citizens, N.A. Compl.  ¶ 29.  Plaintiff paid the Financial Defendants $100,000 for arranging this swap agreement.  *Id.*

On September 25, 2009, Lehman informed Plaintiff that Lehman had no record of Plaintiff terminating the swap agreement.  *Id.* ¶ 30.  After Plaintiff provided facsimile confirmations to Lehman showing that Plaintiff had faxed the notices, Plaintiff again "received a notification from Lehman that it had no record of a termination of the Swap Agreement." *Id.* ¶ 38.  Since then, "Lehman has repeatedly maintained that it has absolutely no record of receipt of the termination notice by any means of communication." *Id.* ¶ 34.

Additionally, Lehman notified Plaintiff that facsimile transmission was not an effective means of delivery under the swap agreement.  *Id.* ¶ 31.  Plaintiff consulted the Financial Defendants regarding Lehman's assertions.  *Id.* ¶ 32.  In October 2009, the Financial Defendants

informed Plaintiff "that fax was an appropriate method of delivery of termination of the Swap Agreement and that [Plaintiff] 'followed the language articulated in the swap document for termination.'"  *Id.*  When Lehman maintained its position, Plaintiff again "requested guidance on the issue" from the Financial Defendants.  Compl. ¶ 35.

The Financial Defendants responded by informing Plaintiff "that bond counsel, specifically attorneys with Peck Shaffer, [had been] engaged by Lancaster Pollard 'to provide the appropriate legal advice for terminating these swaps.'"  *Id.* ¶ 36.

### E

About this time, the bankruptcy judge presiding over the Lehman bankruptcy entered an order requiring "those parties who were subject to claims of Lehman to enter into a non-binding mediation of such disputes prior to adjudicating the merits in the Bankruptcy Court."  Compl. ¶ 37.  Plaintiff did so.  *Id.* ¶¶ 37–40.  "Based on its assessment of the factual and legal basis of Lehman's claims," the complaint reports, "[Plaintiff] entered into negotiations with Lehman and entered into a Termination Agreement settling all claims of Lehman in exchange for payment."  *Id.* ¶ 39.  The complaint does not, however, report the terms of this agreement.

### F

In February 2012, Plaintiff filed a seven-count complaint in the Huron County Circuit Court.  Counts six and seven of the complaint assert legal malpractice claims against the Legal Defendants.[3]

Specifically, count six alleges that "[Mr.] George contacted Lancaster Pollard to provide legal advice to Lancaster Pollard's clients, including [Plaintiff], related to their rights and

---

[3] It should be noted that the breach of contract claim in count two could be construed to state a claim against the Legal Defendants.  *See* Compl. ¶¶ 50–65.  Although Legal Defendants do not address count two in moving to dismiss the complaint, they do write in passing: "Neither Mr. George nor [Peck Shaffer] is alleged to have any contact, much less contract, with Plaintiff."  Legal Defs.' Mem. Supp. Mot. Dismiss 9.  Plaintiff does not respond to this contention.

obligations under their respective Swap Agreements with Lehman and the procedures for terminating said agreements, after the Lehman Bankruptcy." Compl. ¶ 89. "[Mr.] George knew and had every reason to know," count six continues, "that the legal services that he provided to Lancaster Pollard in Ohio, were intended for the benefit of Lancaster Pollard's respective clients, and would be transmitted by Lancaster Pollard to [Plaintiff] in Michigan and that [Plaintiff] would likely rely upon and follow said legal advice as it relates to the termination of the Swap Agreement." *Id.* ¶ 93.

Count six further asserts: "An attorney-client relationship was established between [Plaintiff] and [Mr.] George, in that [Plaintiff] knew that the ultimate advice it received from Lancaster Pollard and/or [Ms.] Hahn had been approved and/or generated by an attorney with Peck Schaffer, [Plaintiff] paid for legal advice related to the termination of the Swap Agreement, [Plaintiff] reasonably relied on the advice it was given by Peck Shaffer and/or its attorneys, and [Mr.] George knew that his advice would be relied on by [Plaintiff]." *Id.* ¶ 98.

Count six concludes by asserting that Mr. George breached his professional duty by rendering erroneous advice and that "[Mr.] George's advice to terminate the Swap Agreement via facsimile transmission is the direct and proximate cause of the damages suffered by Plaintiff." *Id.* ¶ 102. Count seven asserts that because Mr. George is a partner with Peck Schafer, "[u]nder the tenets of principal and agent law, Peck Shaffer is liable to [Plaintiff] for the damages sustained as a direct and proximate cause of the acts and omissions of [Mr.] George." *Id.* ¶ 105.

As relief, Plaintiff requests a declaration that the Legal Defendants committed legal malpractice and money damages "for the amount that [Plaintiff] paid to settle the claims of

Lehman, as well as attorneys' fees and costs related to the settlement of those claims." *Id*. ¶ 102(B).

Defendants were served in March 2012. The following month, Defendants removed the case to this Court based on diversity of citizenship. ECF No. 1.

### G

On April 12, 2012, the Financial Defendants filed a cross-claim for indemnification against the Legal Defendants. ECF No. 3. If the Financial Defendants are liable to Plaintiff, the cross-claim asserts, the Legal Defendants are liable to the Financial Defendants.

The cross-claim elaborates that after Lehman filed for bankruptcy, "[Mr.] George offered to provide legal advice for Defendants' clients, including Plaintiff, regarding their rights and obligations under their swap agreements, whether those agreements should and could be terminated, and the procedures for terminating them. Defendants accepted [Mr.] George's offer. [Mr.] George thereupon developed a procedure and methodology for terminating the swap agreements of Defendant's clients, including Plaintiff, and prepared written notices therefore and instructions for the manner of their transmittal to Lehman." Defs.' Cross-Cl. ¶ 8.

The cross-claim continues: "Defendants transmitted [Mr.] George's legal advice to Plaintiff in its entirety. . . . If Defendants have any liability to Plaintiff for the matters asserted in the Complaint, which they specifically deny, then such liability is the direct and proximate result of [Mr.] George's violation of [his] standard of care by, among other things, providing legal advice with respect to the termination of Plaintiff's swap agreement without even reading the contract or otherwise determining what it provided." *Id*. ¶¶ 10, 12. Finally, the cross-claim asserts that because Mr. George is a partner with Peck Schafer, the firm is also liable for any judgment entered against the Financial Defendants. *Id*. ¶¶ 14–15.

Rather than answering the complaint and cross-claim, the Legal Defendants filed the motions to dismiss now before the Court.  ECF Nos. 5, 6.

## II

The Legal Defendants move to dismiss the complaint for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) and for lack of personal jurisdiction pursuant to Rule 12(b)(2).

## A

To survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555–56).  A court must accept all factual content in the pleading as true, however, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. . . .  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

In this case, the Legal Defendants assert that the complaint does not state a plausible claim for relief for four reasons.  First, Plaintiff does not have a "direct attorney-client relationship" with the Legal Defendants.  Legal Defs.' Mem. Supp. Mot. Dismiss Compl. 10

("Legal Defs.' Br."), ECF No. 5.   Second, Plaintiff is not a third-party beneficiary of the attorney-client relationship between the Legal Defendants and the Financial Defendants.   *Id.* at 12.   Third,   "Inasmuch as [Plaintiff] was not liable to Lehman for any damages resulting from its sending its notice of termination of the Swap Agreement by facsimile transmission, the undisclosed settlement payment that [Plaintiff] elected to make to Lehman based on the allegedly ineffective transmission rendered [Plaintiff] a volunteer, barred from seeking any recovery from [the Legal Defendants]."   *Id.* at 15.   Finally, because Plaintiff did not provide notice of Lehman's claims and an opportunity to defend, Plaintiff "waived any claim to the remedy of indemnification."   *Id.* at 16.

## 1

As a threshold matter, the Legal Defendants first argue that in evaluating whether the complaint states a claim for legal malpractice, this Court should apply the substantive law of Ohio.

A federal court sitting in diversity applies the choice-of-law rules of the state in which the court sits.   *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941).   Here, that state is Michigan.

In Michigan, legal malpractice sounds in tort.   *Charles Reinhart Co v. Winiemko*, 513 N.W.2d 773, 775 (Mich. 1994).   To decide tort choice-of-law issues, Michigan applies the lex fori rule.   *Burney v. PV Holding Corp.*, 553 N.W.2d 657, 659 (Mich. Ct. App. 1996).[4]   This rule

---

[4] Traditionally, "Michigan courts used the lex loci delicti rule in deciding choice-of-law issues."   *Burney v. PV Holding Corp.*, 553 N.W.2d 657, 659 (Mich. Ct. App. 1996) (citing *Sexton v. Ryder Truck Rental, Inc.*, 320 N.W.2d 843 (Mich.1982); *Abendschein v. Farrell*, 170 N.W.2d 137 (Mich. 1969)).   Under the lex loci delicti rule, the law to be applied is the law of the place of the wrong (usually, the state in which the injury occurred).   *See generally Restatement (First) of Conflict of Laws* § 377 (1934) ("The place of wrong is in the state where the last event necessary to make an actor liable for an alleged tort takes place."); Eugene Scoles et al., *Conflict of Laws* § 17.2 (hornbook ed. 2004) (discussing lex loci delicti rule).   In 1982, however, the Michigan Supreme Court "abandoned the traditional lex loci doctrine for resolving conflicts between the tort laws of different states."   *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 702 (Mich. 1995) (citing *Sexton v. Ryder Truck*

provides that "the law of the forum state (lex fori) should apply unless there is a 'rational reason' to displace it."  *Id.*; *see also Mahne v. Ford Motor Co.*, 900 F.2d 83, 86 (6th Cir. 1990) (noting that Michigan now applies lex fori rule); *see generally* Eugene Scoles et al., *Conflict of Laws* § 17.12 (hornbook ed. 2004) (discussing lex fori rule).

"In determining whether a rational reason to displace Michigan law exists," the Michigan Supreme Court explains, "we undertake a two-step analysis.  First, we must determine if any foreign state has an interest in having its law applied.  If no state has such an interest, the presumption that Michigan law will apply cannot be overcome.  If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interests."  *Sutherland v. Kennington Truck Serv., Ltd*, 562 N.W.2d 466 (Mich. 1997) (citing *Olmstead v. Anderson*, 400 N.W.2d 292 (Mich. 1987)).  Although this analysis "most frequently favors the forum (Michigan's) law, Michigan courts nonetheless use another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter."  *Hall v. Gen. Motors, Corp.*, 582 N.W.2d 866, 868 (Mich. Ct. App. 1998).

In this case, Peck Shaffer is a law firm based in Ohio and Mr. George is an attorney licensed to practice in Ohio.  Regulated by the state of Ohio, that state has a legitimate interest in ensuring that the persons whom it entrusts the practice of law fulfill their professional obligations.  Thus, Ohio has an interest in having its law applied.

Michigan, however, also has an interest in having its law applied.  Plaintiff operates a hospital located in Michigan.  The hospital serves Michigan residents.  And the subject matter of the alleged legal representation — financing capital improvements to the hospital's facilities and

---

*Rental*, 320 N.W.2d 843 (Mich. 1982) (plurality)).  Instead, Michigan now applies the lex fori rule.  *E.g., Sutherland v. Kennington Truck Serv., Ltd*, 562 NW2d 466 (Mich. 1997).

refinancing existing debts of the hospital — concerns Michigan interests.   Michigan has a legitimate interest in the financial health of its hospitals.   And Michigan has an interest in protecting the quality of health care facilities serving Michigan residents.   Under the circumstances, it cannot be said that Ohio "has a significant interest and Michigan has only a minimal interest in the matter."   *Hall*, 582 N.W.2d at 868.   Michigan tort law applies.

2

A legal malpractice claim has four elements under Michigan law: "(1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was a proximate cause of an injury; (4) the fact and extent of the injury alleged." *Coleman v. Gurwin*, 503 N.W.2d 435, 436–37 (Mich. 1993) (footnotes omitted).   The Legal Defendants challenge the first and third elements.

a

Although legal malpractice sounds in tort, "an attorney-client relationship is based on contract."   *Jackson v. Pollick*, 751 F. Supp. 132, 134 (E.D. Mich. 1990) (Feikens, J.).   The relationship need not be memorialized in a writing to be enforceable.   *Macomb Cnty. Taxpayers Ass'n v. L'Anse Creuse Pub. Schs.*, 564 N.W.2d 457, 462 (Mich. 1997).   Rather it is the intent of the parties, as manifested by their actions, that determines the existence and the terms of the agreement: "[T]he relation of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship.   The contract may be implied from conduct of the parties."   *Id.* (quoting 7 Am. Jur. 2d, *Attorneys at Law* § 118).   In articulating these principles, the Michigan Supreme Court finds the authorities collected in *American Jurisprudence* persuasive.   *Id.* (explaining "We agree with the authorities cited in 7 Am. Jur. 2d

-13-

*Attorneys at Law* § 118" and "Again, authorities cited in 7 Am. Jur. 2d, *Attorneys at Law*, § 237, p. 277, properly state, in our opinion, the relevant principle").

*American Jurisprudence*, in turn, observes that "with limited exceptions, an attorney owes no actionable duty to strangers or non-parties to the attorney-client relationship in the way legal responsibilities are performed."   7 Am. Jur. 2d, *Attorneys at Law* § 234.   One such exception "is a third-party beneficiary to an agreement between the attorney and his or her client."   *Id*.   "Privity between an attorney and a non-client is not necessary for a duty to attach," *American Jurisprudence* reports, "when the attorneys know, or should know, that non-clients will rely on the attorney's representations and the non-clients are not too remote from the attorneys to be entitled to protection."   *Id*. (footnote omitted).   Consequently, to establish third-party beneficiary status "both the attorney and the client must have intended the third party to be the beneficiary of legal services that the attorney was to render."   *Id*. § 234; *cf. Williams v. Polgar*, 215 N.W.2d 149, 154 (Mich. 1974) (holding title abstractor liable to third party despite lack of privity when abstractor either knows third party will rely on the abstract or "can reasonably foresee reliance by a third-party"); *Restatement (Second) of Torts* § 552 (1977) (noting that to impose third-party liability, there must be justifiable reliance upon the information by a limited group of persons for whose benefit and guidance the defendant intends to supply the information or knows that the recipient of the information intends to supply it).

Michigan has codified its third-party beneficiary law in § 600.1405 of the Michigan Compiled Laws.   "Any person for whose benefit a promise is made by way of contract," that section provides, "has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee."   Mich. Comp. Laws § 600.1405.   The section requires, however, that the promisor must agree to do something "directly" for the

promisee: "A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person." *Id*. § 600.1405(1).

 "By using the modifier directly," the Michigan Supreme Court explains, "the Legislature intended to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract." *Schmalfeldt v. North Pointe Ins. Co.*, 670 N.W.2d 651, 654 (Mich. 2003) (citing § 600.1405).  Thus, the focus of the inquiry is whether the contract contains a promise to directly benefit the third party.  *Id*. at 655.

In this case, the complaint alleges that the Legal Defendants offered "to provide legal advice to Lancaster Pollard's clients, including [Plaintiff]."  Compl. ¶ 89.  Lancaster Pollard accepted the offer.  *Id*. ¶¶ 90–95.  The Legal Defendants then "reviewed the files of Lancaster Pollard's clients, including [Plaintiff's] files along with its Swap Agreement, in the Lancaster Pollard office."  *Id*. ¶ 90.  After reviewing the files, the Legal Defendants "developed the procedure for which Lancaster Pollard's clients, including [Plaintiff], were to terminate their respective Swap Agreements with Lehman."  *Id*. ¶ 91.

Based on these allegations, an attorney-client relationship existed between the Legal Defendants and the Financial Defendants — not between the Legal Defendants and Plaintiff.[5]  The Legal Defendants made an offer of services to the Financial Defendants, not to Plaintiff.  The Financial Defendants accepted the Legal Defendants' offer; Plaintiff did not.  The Legal

---

[5] Plaintiff does not allege that the Financial Defendants acted as Plaintiff's agent in securing the legal advice of the Legal Defendants, either expressly or by reasonable implication.  (Such a relationship cannot be inferred from the factual allegations in the complaint as there is no suggestion that Plaintiff had the right to control the actions of the Financial Defendants in securing legal representation.  *See, e.g.*, *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992). ("The test of whether an agency has been created is whether the principal has a right to control the actions of the agent.").)

Defendants rendered legal services to the Financial Defendants; the Financial Defendants compensated the Legal Defendants. The attorney-client relationship created by the offer, acceptance, and consideration was between the Financial Defendants and the Legal Defendants, not Plaintiff the Legal Defendants.

Plaintiff was, however, a third-party beneficiary of the attorney-client relationship between the Legal Defendants and the Financial Defendants. The basis of Defendants' relationship was to provide legal advice for the direct benefit of the Financial Defendants' clients, including Plaintiff. Moreover, the complaint alleges that the relationship directly identified Plaintiff as the intended beneficiary: the relationship allegedly began when Legal Defendants offered "to provide legal advice to Lancaster Pollard's clients, including [Plaintiff], related to their rights and obligations under their respective Swap Agreements." Compl. ¶ 89. The Financial Defendants accepted the Legal Defendants' offer to provide legal advice to Plaintiff. *Id*. ¶¶ 90–95. The Legal Defendants then reviewed "[Plaintiff's] files along with its Swap Agreement, in the Lancaster Pollard office" and drafted the correspondence for Plaintiff terminating the swap agreement. *Id*. ¶¶ 90, 91. In doing so, the Legal Defendants "knew and had every reason to know that the legal services that [were] provided to Lancaster Pollard in Ohio, were intended for the benefit of Lancaster Pollard's respective clients, and would be transmitted by Lancaster Pollard to [Plaintiff] in Michigan." *Id*. ¶ 93. Based on this conduct, Plaintiff has plausibly alleged that it was a third-party beneficiary of the attorney-client relationship of Defendants.

Against this conclusion, the Legal Defendants argue that Michigan law construes third-party beneficiary status quite narrowly.

The Legal Defendants are correct that under Michigan law third-party beneficiary status is a "narrow exception to the privity requirement for a legal malpractice claim." Legal Defs.' Br. 11; *see generally Torts: Michigan Law and Practice* § 7.9 (ICLE 2011) (discussing evolution of requirement of privity for legal malpractice claims in Michigan and noting "third parties without privity who attempt to hold attorneys liable still face considerable difficulties").

Nevertheless, Plaintiff has plausibly alleged that it is a third-party beneficiary. As noted, the primary purpose of Defendants' relationship was to provide legal advice for the direct benefit of the Financial Defendants' clients, including Plaintiff. As Justice Cardozo observed nearly a century ago when faced with a similar question,

> [T]he bounds of duty are enlarged by knowledge of a prospective use. We must view the act in its setting . . . . [T]he defendants' promise [embraced] the rendition of a service, which, though ordered and paid for by one, was either wholly or in part for the benefit of another. . . . Diligence was owing, not only to him who ordered, but to him also who relied.

*Glanzer v. Shepard*, 135 N.E. 275, 240–41 (N.Y. 1922) (internal citations omitted), *quoted in part in Williams v. Polgar*, 215 N.W.2d 149, 11 n.3 (Mich. 1974).

Here, the complaint alleges that the Financial Defendants' legal services, though ordered and paid for by the Financial Defendants, were for the direct benefit of Plaintiff. If true, Plaintiff was a third party beneficiary of Defendants' attorney-client relationship. The Legal Defendants challenge to the first element of Plaintiff's legal malpractice claim is unpersuasive.

**b**

Next, the Legal Defendants challenge the third element of Plaintiff's legal malpractice claim — whether the complaint alleges that the negligence of the Legal Defendants was a proximate cause of Plaintiff's injury.

The Legal Defendants argue that Plaintiff cannot establish proximate cause because "even if [Plaintiff] did not strictly comply with the Swap Agreement's notice provisions" the faxed notice was effective.  Legal Defs.' Br. 14.  "Where actual notice of termination has in fact been given," Defendants assert, under New York Law "the form is of little import."  *Id.* (quoting *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers*, 706 F. Supp. 2d 350, 360 (S.D.N.Y. 2009)).  "Inasmuch as [Plaintiff] was not liable to Lehman for any damages resulting from its sending its notice of termination of the Swap Agreement by facsimile transmission," the Legal Defendants continue, "the undisclosed settlement payment that [Plaintiff] elected to make to Lehman based on the allegedly ineffective transmission rendered [Plaintiff] a volunteer, barred from seeking any recovery from [the Legal Defendants]."  Legal Defs.' Br. 15.

As a preliminary matter, it is not obvious from the complaint that New York law applies. Section 11 of the swap agreement provides the choice-of-law, specifying that it "will be governed by and construed in accordance with the law specified in the Schedule."  *Id.* § 11(a). Yet the copy of the schedule attached to the complaint appears to be incomplete, and the choice-of-law provision is missing.  Nevertheless, it is reasonable to infer that the agreement selects New York law.  Although the complete schedule is not attached, the attached guarantee of Lehmann Brothers (exhibit B to the schedule), selects New York law.  It is unlikely that the guarantee would select New York law, while the agreement would select another state's law. Plaintiff likewise does not dispute that New York law applies.

Rather, Plaintiff disputes that Lehman ever acknowledged receiving actual notice of Plaintiff's termination of the agreement, writing: "[The Legal Defendants] repeatedly assert, erroneously, that Lehman did not dispute that it had received actual notice of termination. . . .  At no time has Lehman made any admission as to having received the facsimile termination or any

other purported termination from [Plaintiff]." Pl.'s Resp. 15. Plaintiff is correct that the complaint does not state that Lehman acknowledged receiving actual notice of Plaintiff's termination of the agreement. In fact, the complaint asserts the opposite.

Paragraph 30 alleges that on September 25, 2009, Lehman informed Plaintiff that Lehman had no record of Plaintiff terminating the swap agreement. Compl. ¶ 30. The complaint further alleges that after Plaintiff provided facsimile confirmations to Lehman showing that Plaintiff had sent the notices via fax, Plaintiff "received a notification from Lehman that it had no record of a termination of the Swap Agreement." *Id.* ¶ 38. Since then, "Lehman has repeatedly maintained that it has absolutely no record of receipt of the termination notice by any means of communication." *Id.* ¶ 34.

Thus, the Legal Defendants may be correct that New York law deems actual notice sufficient — although the law on this issue is not altogether uniform. *Compare Rockland Exposition*, 706 F. Supp. 2d at 360 ("Under New York law, timely notice that violates the terms of the contract is proper so long as it is actually received and no prejudice results."), *and Ives v. Mars Metal Corp.*, 196 N.Y.S.2d 247, 249 (N.Y. Sup. Ct. 1960) ("Where actual notice of termination has in fact been given, the form is of little import."), *with In re St. Casimir Development Corp.*, 358 B.R. 24, 41 (S.D.N.Y. 2007) ("New York law requires parties to strictly comply with a contract's notice provisions."), *and First Nat. Bank of Chi. v. Ackerley Comm'ns, Inc.*, No. 94 Civ. 7539(KTD), 2001 WL 15693, at* 4 (S.D.N.Y. 2001) ("It is hornbook law that when the terms of a written contract are clear and unambiguous and those terms require written notification in a particular manner then such notification can be given only in that manner.").

This Court need not resolve whether actual notice is sufficient under New York law, however, because the complaint does not contain any allegation that Lehman actually admitted

receiving the faxed termination notices.  Rather, the complaint alleges "Lehman has repeatedly maintained that it has absolutely no record of receipt of the termination notice by any means of communication."  Compl. ¶ 34.  Consequently, as another district court observed in denying a motion to dismiss in a case arising out of similar facts,

> For [the plaintiff's] claim to be barred at this stage under New York law, [the plaintiff] must have pled facts to support Lehman's actual notice of the termination via facsimile. . . .  The Amended Complaint contains no allegation that Lehman actually admitted receiving the fax, only Lehman's opinion that transmission by facsimile would be considered ineffective under New York law. Specific factual details, such as whether the fax machine malfunctioned or whether the fax number was disconnected are not necessary at this stage of the proceedings.  All that is necessary is a sufficient factual basis to support the claims.  Taking these facts in the light most favorable to [the plaintiff], the inference that Lehman did not receive actual notice of the termination is logical. Therefore, [the plaintiff] has plead with sufficient particularity facts which support its claims.

*Good Samaritan Home, Inc. v. Lancaster Pollard & Co.*, No. 3:11–cv–00075–RLY–WGH, 2012 WL 952825, at *4 (S.D. Ind. Mar. 20, 2012) (internal citations omitted).

In this case, as in *Good Samaritan*, the Legal Defendants' argument that Plaintiff's claim is barred because of actual notice lacks merit.  The Legal Defendants challenge to the third element of Plaintiff's legal malpractice claim is unpersuasive.

**c**

Next, the Legal Defendants assert the complaint does not state a claim on which relief can be granted because Plaintiff did not provide the Legal Defendants notice of Lehman's claims or Plaintiff's intent to settle.  Legal Defs.' Br. 16.  "Due to [Plaintiff's] failure to provide notice of the claims and an opportunity to defend or settle," the Legal Defendants write, Plaintiff "waived any claim to the remedy of indemnification."  *Id.*

Indemnification is a form of derivative liability.  *See generally* 41 Am. Jur. 2d *Indemnity* § 20 (noting "the party seeking indemnity must have imputed or derivative liability for the

tortious conduct from which indemnity is sought"). "The basis for indemnity is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay." *Restatement (Second) of Torts* § 886B cmt. c (1979).

The Michigan Supreme Court explains that common law indemnification "is an equitable doctrine that shifts the entire burden of judgment from one tortfeasor who has been compelled to pay it, to another whose active negligence is the primary cause of the harm." *St. Luke's Hosp. v. Giertz*, 581 N.W.2d 665, 668 (Mich. 1998). "The right to common-law indemnification is based on the equitable principle that where the wrongful act of one party results in another being held liable, the latter party is entitled to restitution." *N. Cmty. Healthcare, Inc. v. Telford*, 556 N.W.2d 180, 182 (Mich. Ct. App. 1996).

"Implied contractual indemnity" is also recognized by the Michigan Supreme Court. *Dale v. Whiteman*, 202 N.W.2d 797, 800 (Mich. 1972) ("Courts have found various grounds for granting indemnity. Probably the simplest situation is one in which the parties have entered into a written contract in which one party has clearly agreed to indemnify the other. Next are those cases where the contract terms are such that a right of indemnification can be implied."). "In order to establish an implied contract to indemnify, there must be a special relationship between the parties or a course of conduct whereby one party undertakes to perform a certain service and impliedly assures indemnification." *Palomba v. City of E. Detroit*, 315 N.W.2d 898, 902 (Mich. Ct. App. 1982).

The Michigan Supreme Court further observes that "notice and opportunity to participate in the settlement" is not required to state a claim for indemnity, cautioning: "In the event that an indemnitor is not afforded the alternative of participating in a settlement or conducting the

defense against the original claim, an indemnitee settling the claim will have the burden of establishing actual liability to the original plaintiff rather than the lesser burden of showing potential liability." *St. Luke's Hosp.*, 581 N.W.2d at 668 & n.2.

In this case, the substantive cause of action raised by the complaint is legal malpractice, not indemnification. *See generally Muir v. Hadler Real Estate Mgmt. Co.*, 446 N.E.2d 820, 822 (Ohio Ct. App. 1982) ("Essentially, [the defendant] contends that its claim against [the third-party defendant] is predicated upon indemnification, rather than malpractice. We disagree. . . . This is not a true case of primary-secondary liability, with the person secondarily liable having paid the claim and seeking indemnification from the person primarily liable, inasmuch as an attorney is not liable to third persons for damages arising from the performance of the attorney's professional activities on behalf of, and with the knowledge of, his client, even though the client may become liable because of the attorney's activities.").

Plaintiff's liability to Lehman was founded on breach of contract. And although the breach was allegedly caused by the Legal Defendant's negligence, Plaintiff's breach of contract was not derivative of the Legal Defendants' negligence. Lehman could not have maintained a cause of action against the Legal Defendants for negligence. The Legal Defendants' negligence (more precisely, their duty of care) flowed to the Financial Defendants and on to Plaintiff, but not to Lehman. As Plaintiff and the Legal Defendants are not joint tortfeasors, common law indemnification does not apply. Implied contractual indemnity is likewise inapplicable. No facts in the complaint suggest that the Defendants' contract contains an implicit promise to indemnify third party beneficiaries of the contract.

Moreover, even if this Court were to construe the complaint to implicitly bring a claim for indemnification rather than legal malpractice, notice and opportunity to participate in the

settlement are not required to state a claim for indemnity under Michigan law.  The complaint against the Legal Defendants states claims on which relief may be granted.

**B**

Finally, the Legal Defendants move to dismiss the complaint for lack of personal jurisdiction.

Personal jurisdiction has both statutory and constitutional components.  A court may exercise personal jurisdiction over an out-of-state defendant only after confirming both that the state long-arm statute authorizes jurisdiction over the nonresident defendant and that the exercise of personal jurisdiction would not deny the defendant his constitutional right to due process of law.  *Omni Capital Int'l v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987); *see also* Mich. Comp. Laws §§ 600.705, .725.

Here, the Legal Defendants focus on the statutory basis for asserting personal jurisdiction, arguing that they are "entitled to dismissal for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) because of the absence of any allegation that any element of M.C.L. § 600.705 has been satisfied."  Defs.' Br. 16–17.  (The Legal Defendants do not assert that exercising personal jurisdiction would deprive them of their constitutional rights to due process of law.)

Contrary to the Legal Defendants' contention, the complaint does allege a sufficient predicate for the exercise of personal jurisdiction over them pursuant to Michigan's long arm statute — the complaint alleges that the Legal Defendants committed the tort of legal malpractice and that Plaintiff suffered the consequences of the tortious conduct in Michigan.  *See* Mich. Comp. Laws §§ 600.705(2), .725(2) (authorizing the exercise of limited personal jurisdiction over nonresident defendant "causing an act to be done, or consequences to occur, in the state

resulting in an action for tort"); *Charles Reinhart Co v. Winiemko*, 513 N.W.2d 773, 775 (Mich. 1994) (observing that legal malpractice claims sound in tort).

Specifically, count six alleges that Mr. George offered "to provide legal advice to Lancaster Pollard's clients, including [Plaintiff]." Compl. ¶ 89. Mr. George then rendered legal advice knowing it "would be transmitted by Lancaster Pollard to [Plaintiff] in Michigan and that [Plaintiff] would likely rely upon and follow said legal advice." *Id*. ¶ 93. The advice was transmitted to Plaintiff in Michigan, where it was followed. *Id*. ¶¶ 20–27. Because it was erroneous, however, Plaintiff was forced to compensate Lehman. *Id*. ¶ 102. As Plaintiff is a Michigan non-profit corporation operating a hospital in Michigan, the consequences were felt in Michigan. Personal jurisdiction over the Legal Defendants is authorized pursuant to Michigan's long arm statute.

## III

The Legal Defendants move to dismiss the Financial Defendants' cross-claim for not stating a claim on which relief can be granted and for lack of personal jurisdiction. For the reasons discussed above, the Legal Defendants' personal jurisdiction argument is unpersuasive.

### A

For four reasons, the Legal Defendants argue, the cross-claim does not state a claim on which relief can be granted. First, the Financial Defendants are not entitled to indemnification because they engaged in the unauthorized practice of law when they "provided [Plaintiff] legal documents." Legal Defs.' Mem. Supp. Mot. Dismiss Cross-Cl. 9 ("Legal Defs.' Cross-Cl. Br."), ECF No. 6. Second, "there can be neither common law nor implied indemnification where, as here, the Complaint alleges affirmative negligence by [the Financial Defendants]." *Id*. at 12. Third, the Financial Defendants are not entitled to indemnification because the Legal Defendants

did not commit malpractice:  "New York law does not require strict compliance with notice provisions."  *Id*. at 14.  Finally, even if Financial Defendants are entitled to indemnification for the legal malpractice claim (count three of the complaint), they are not entitled to indemnification for the breach of contract claims (counts one and two), the breach of fiduciary claims (count four), or the punitive damages claim (count five).

## 1

As a preliminary matter, it should be noted that although the Legal Defendant again argue that Ohio law applies to the cross-claim, their argument is again unpersuasive.  In pertinent part, the cross-claim alleges that "judgment should be entered against [the Legal Defendants] and in favor of [the Financial Defendants] for all sums which may be adjudged against them and in favor of Plaintiff."  Financial Defs.' Cross-Cl. ¶ 16.  Put simply, it seeks indemnification.

Indemnification, as noted, is a form of derivative liability.  *See generally* 41 Am. Jur. 2d *Indemnity* § 20.  Because Michigan law applies to the primary claims asserted in the complaint for reasons detailed above, Michigan law also applies to the derivative indemnity claims asserted in the cross-claim.  *See, e.g*, *In re Air Crash Disaster*, 86 F.3d 498, 544 (6th Cir. 1996) (noting that in Michigan "courts decide indemnity claims according to the law applied to the underlying tort").

## 2

Under Michigan law, the practice of law is regulated by statute.  Mich. Comp. Laws § 450.681; *see Dressel v. Ameribank*, 664 N.W.2d 151, 154 (Mich. 2003).  "It shall be unlawful for any corporation or voluntary association to practice or appear as an attorney-at-law for any person other than itself in any court in this state or before any judicial body," that section

provides, "or to hold itself out to the public as being entitled to practice law, or render or furnish legal services or advice."  Mich. Comp. Laws § 450.681.

"The line between what is and what is not the practice of law cannot be drawn with precision," the Michigan Supreme Court cautions, explaining: "Lawyers should be the first to recognize that between the two there is a region wherein much of what lawyers do every day in their practice may also be done by others without wrongful invasion of the lawyers' field." *Petitions of Ingham Cnty. Bar Ass'n*, 69 N.W.2d 713, 719 (Mich. 1955) (quoting *Cowern v. Nelson*, 290 N.W. 795, 797 (Minn. 1940)).

"Some activities are plainly the practice of law," the court elaborates, continuing: "It is too obvious for discussion that the conduct of cases in courts is the practice of law, as is the preparation of pleadings and other papers incident to actions . . . .  It is likewise obvious that, for the same reason, the practice of law includes the giving of legal advice in any action taken for others in any matter connected with the law, even though unrelated to any action in court." *Dressel*, 664 N.W.2d at 155–56 (internal quotation marks and citations omitted) (quoting *Grand Rapids Bar Ass'n v. Denkema*, 287 N.W. 377 (Mich. 1939); *Detroit Bar Ass'n v. Union Guardian Trust C*o., 276 N.W. 365 (Mich. 1937)).

In this case, the cross-claim asserts that after Lehman filed for bankruptcy, "[Mr.] George offered to provide legal advice for [the Financial Defendants'] clients, including Plaintiff." Defs.' Cross-Cl. ¶ 8.   The Financial Defendants accepted.   *Id*.   "[Mr.] George thereupon developed a procedure and methodology for terminating the swap agreements of Defendant's clients, including Plaintiff, and prepared written notices therefore and instructions for the manner of their transmittal to Lehman."  *Id*.  After the written notices were prepared, "[the Financial Defendants] transmitted [Mr.] George's legal advice to Plaintiff in its entirety."  *Id.* ¶ 10.

It is possible to interpret these allegations as suggesting that the Financial Defendants "furnish[ed] legal services or advice." Mich. Comp. Laws § 450.681. Perhaps they held themselves out as having prepared the legal advice when they transmitted it to Plaintiff. But drawing all reasonable inferences in the Financial Defendants' favor, as the Court must on a motion to dismiss their cross-claim, these allegations do not suggest that the Financial Defendants engaged in the unauthorized practice of law.

Rather, the cross-claim alleges that Mr. George prepared the documents and Financial Defendants merely "transmitted [Mr.] George's legal advice in its entirety." Defs.' Cross-Cl. ¶ 10. Transmitting legal advice from an attorney to the intended recipient is not necessarily synonymous with furnishing legal advice — Federal Express does not engage in the unauthorized practice of law each time it delivers a document containing legal advice from the attorney to the intended recipient. That is, acting as a conduit for an attorney's work is not the same as holding oneself out as an attorney. Read in the light most favorable to the Financial Defendants, the cross-claim alleges that they essentially acted as a mere courier of the Legal Defendants' advice.[6]

The Legal Defendants' assertion that the Financial Defendants are not entitled to indemnification because they engaged in the unauthorized practice of law is unpersuasive.

**3**

Next, the Legal Defendants assert that "there can be neither common law nor implied indemnification where, as here, the Complaint alleges affirmative negligence by [the Financial Defendants]." Legal Defs.' Cross-Cl. Br. 12.

---

[6] The cross-claim does not allege that the Financial Defendants billed Plaintiff for "legal fees." Although this allegation would support the Legal Defendants' argument, on a 12(b)(6) motion to dismiss, the Court cannot consider such extrinsic allegations. *Unifoil Corp. v. Cheque Printers & Encoders Ltd.*, 622 F. Supp. 268, 269 (D.N.J. 1985).

Contrary to the Legal Defendants' assertion, however, in evaluating a motion to dismiss a cross-claim for failure to state a claim, the Court must accept as true the allegations made in the cross-claim, not the complaint. *E.g.*, *Unifoil Corp. v. Cheque Printers & Encoders Ltd.*, 622 F. Supp. 268, 269 (D.N.J. 1985); *Sebo United Air Lines*, 10 F.R.D. 327, 329 (S.D.N.Y. 1950).

Here, the cross-claim does not allege affirmative negligence by the Financial Defendants. On the contrary, it asserts that it was Legal Defendants who were negligent: "If [the Financial Defendants] have any liability to Plaintiff for the matters asserted in the Complaint, which they specifically deny, then such liability is the direct and proximate result of [Mr.] George's violation of [his] standard of care by, among other things, providing legal advice with respect to the termination of Plaintiff's swap agreement without even reading the contract or otherwise determining what it provided." Counter-Cl. ¶ 12.

The Legal Defendants' assertion that the cross-claim does not state a claim for relief because the complaint alleges that the Financial Defendants were negligent is unpersuasive.

**4**

The Legal Defendants next assert the Financial Defendants are not entitled to indemnification because the Legal Defendants did not commit malpractice, reiterating "New York law does not require strict compliance with notice provisions." Legal Defs.' Cross-Cl. Br. 14.

As discussed above, the Legal Defendants may be correct that New York law deems actual notice sufficient (although the law on this issue is not altogether uniform). But the Legal Defendants are not correct that the undisputed evidence demonstrates that Lehman actually received notice of the termination. *See* Compl. ¶ 34. The Financial Defendants seek

indemnification in the event that either actual notice is not sufficient or that Plaintiff is correct that Lehman lacked actual notice.  Cross-Cl. ¶ 12.

**5**

Finally, the Legal Defendants argue that even if Financial Defendants are entitled to indemnification for the legal malpractice claim (count three of the complaint), they are not entitled to indemnification for the breach of contract claims (counts one and two), the breach of fiduciary claims (count four), or the punitive damages claim (count five).

The Financial Defendants acknowledge as much, countering: "Peck Shaffer and Mr. George argue at length that [the Financial Defendants are] not entitled to indemnification for Plaintiff's breach of contract and breach of fiduciary claims.  But, it is Peck Shaffer and Mr. George, and only Peck Shaffer and Mr. George, who have chosen to characterize the Crossclaim as being only for indemnification.  The words 'indemnify,' 'indemnity,' and 'indemnification' are conspicuously absent from [the Financial Defendants'] Crossclaim.   On its face, the Crossclaim is one for legal malpractice."  Financial Defs.' Resp. 7.

Although the Financial Defendants' are correct that the cross-claim does not contain the term "indemnification," that is the substantive relief that they seek.  Paragraph twelve, for example, asserts: "If [the Financial Defendants] have any liability to Plaintiff for the matters asserted in the Complaint, which they specifically deny, then such liability is the direct and proximate result of [the Legal Defendants'] violation of [their] standard of care by, among other things, providing legal advice with respect to the termination of Plaintiff's swap agreement without even reading the contract or otherwise determining what it provided."  Cross-Cl. ¶  12. "By reason of all of the foregoing," the next paragraph asserts, "judgment should be entered

against [the Legal Defendants] and in favor of [the Financial Defendants] for all sums which may be adjudged against them and in favor of Plaintiff." *Id.* ¶ 13.

Similarly, the Financial Defendants' opposition brief to the motion to dismiss the cross-claim asserts that "the Crossclaim contains facts establishing that it is plausible that they will be liable to [the Financial Defendants] if [the Financial Defendants are] liable to Plaintiff." Financial Defs.' Resp. 7. It elaborates: "By its express terms, [Rule 13(g)] permits a crossclaim even if the co-defendant 'may be liable' to the cross-claimant 'for all or part' of the claim asserted against the cross-claimant." *Id.* at 9.

Again, the Financial Defendants are correct. Rule 13(g) permits "a claim that the coparty is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant." Fed. R. Civ. P. 13(g). That is, the rule authorizes a cross-claim seeking indemnification or contribution against the cross-claimant. *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 805–06 (2d Cir. 1979); *see generally* 61A Am. Jur. 2d *Pleading* § 356 (observing that Rule 13(g) "specifically sanctions claims between coparties for contribution or indemnity").

As noted, indemnification "is an equitable doctrine that shifts the entire burden of judgment from one tortfeasor who has been compelled to pay it, to another whose active negligence is the primary cause of the harm." *St. Luke's Hosp. v. Giertz*, 581 N.W.2d 665, 668 (Mich. 1998). "Where two or more joint tortfeasors have been actively negligent in contributing to an injury," the Michigan Supreme Court cautions, "neither is entitled to indemnification from the other and only a claim for contribution will lie. However, a party who is guilty of only passive negligence or vicarious liability may recover indemnity from the person who is actively negligent." *Id.* at 668.

In this case, the Financial Defendants do not assert an independent claim for malpractice — rather, they assert a derivative claim alleging that if the Financial Defendants are held liable to Plaintiff, then the Legal Defendants are liable to the Financial Defendants. Although the Financial Defendants' are entitled to pursue a contingent liability claim under Rule 13(g), they are not correct that the cross-claim asserts an independent claim for legal malpractice.

As the Financial Defendants concede that they are not entitled to indemnification or contribution for the breach of contract claims (counts one and two), the breach of fiduciary claims (count four), or the punitive damages claim (count five), the Legal Defendants' motion to dismiss the cross-claim will be granted in part and denied in part.

## IV

Accordingly, it is **ORDERED** that the Legal Defendants' motion to dismiss the complaint (ECF No. 5) is **DENIED**.

It is further **ORDERED** that the Legal Defendants' motion to dismiss the cross-claim (ECF No. 6) is **GRANTED IN PART AND DENIED IN PART**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: July 27, 2012

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 27, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS