UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SCHEURER HOSPITAL,

               Plaintiff,

                                                 Case No. 12-11536

v.                                       Honorable Thomas L. Ludington

LANCASTER POLLARD & CO. et al.,

               Defendants.

_____ /

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO
DISMISS CROSS-CLAIM AND GRANTING IN PART AND DENYING
IN PART PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM**

In this professional malpractice case, the immediate question is whether a defendant may assert the statute of limitations as both an affirmative defense and, under a separate heading, a claim for declaratory relief. For reasons detailed below, the Court answers this question in the negative.

In 2001, Plaintiff Scheurer Hospital retained a financial services firm, Defendant Lancaster Pollard & Co., to advise Plaintiff on a bond issuance. To hedge against the risk of rising interest rates, Lancaster Pollard recommended that Plaintiff enter into an interest rate swap agreement with a third-party financial institution, Lehman Brothers. Plaintiff did so. After Lehman sought bankruptcy protection in 2008, Plaintiff consulted Lancaster Pollard regarding the proper manner of terminating the agreement with Lehman. Lancaster Pollard retained a law firm, Defendant Peck Shaffer & Williams. Peck Shaffer advised Lancaster Pollard. It, in turn, advised Plaintiff. The instructions allegedly proved incorrect, however, rendering Plaintiff's termination of the swap agreement ineffective. Consequently, Plaintiff entered into a settlement agreement compensating Lehman. This litigation ensued.

Plaintiff brought suit against Defendants seeking compensation for the damages caused by the allegedly incorrect advice. Lancaster Pollard, in turn, cross-claimed against Peck Shaffer. Peck Shaffer cross-claimed against Lancaster Pollard and counterclaimed against Plaintiff.

In April 2012, Peck Shaffer moved to dismiss Plaintiff's complaint and Lancaster Pollard's cross-claim. ECF Nos. 5, 6. The Court denied the motion to dismiss the complaint and granted in part and denied in part the motion to dismiss the cross-claim. *Scheurer Hosp. v. Lancaster Pollard & Co.*, 12-11536, 2012 WL 3065347 (E.D. Mich. July 27, 2012).

Plaintiff moves to dismiss Peck Shaffer's counterclaim. And Lancaster Pollard moves to dismiss Peck Shaffer's cross-claim. For the following reasons, Plaintiff's motion will be granted in part and denied in part. Lancaster Pollard's motion will be granted.

**I**

Plaintiff is a Michigan not-for-profit corporation that operates a hospital serving the residents of Huron County, Michigan, and the surrounding areas. Compl. ¶ 1. Defendant Lancaster Pollard & Co. is an Ohio corporation specializing in providing financial services to health care providers such as Plaintiff. *Id*. ¶¶ 3, 5. Defendant Tanya Hahn was a managing director at Lancaster Pollard. *Id*. ¶ 4. (Collectively, Lancaster Pollard and Ms. Hahn are referred to as the "Financial Defendants.")

Defendant Peck Shaffer & Williams, LLP, is a law firm headquartered in Ohio that specializes in healthcare financing. *Id*. ¶ 7. Defendant Jason George was a partner at Peck Shaffer. *Id*. ¶ 6. (Collectively, Peck Shaffer and Mr. George are referred to as the "Legal Defendants.")

Plaintiff and Financial Defendants move to dismiss the Legal Defendants' counterclaim and cross-claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Therefore, the following

facts from the Legal Defendants' counterclaim and cross-claim are assumed to be true (certain allegations from the complaint are also included to provide background; in deciding the pending motions, no presumption of truth attaches to the complaint's allegations).

## A

In 2001, Plaintiff sought to finance capital improvements and refinance existing debts by issuing $10 million in bonds. Compl. ¶ 13. The Financial Defendants offered to advise Plaintiff on the matter and to underwrite the bonds. *Id.* ¶¶ 13–14. Plaintiff accepted. *Id.* ¶ 14.

To manage some of the risk associated with the bond issuance, the Financial Defendants recommended that Plaintiff enter into an interest rate swap agreement with a third-party financial institution. *Id.* ¶¶ 15–16. Designed to hedge against the risk of rising interest rates, the swap agreement would identify two rates: a floating rate and a fixed rate. *Id.* ¶ 16. The floating rate would vary with the London Inter-bank Offered Rate ("LIBOR"). *Id.* The fixed rate (as its name suggests) was set by the parties at a single, unvarying rate. *Id.* When the LIBOR fell below the fixed rate, Plaintiff would be required to make payments to the counterparty to the swap agreement. *Id.* When the LIBOR rose above the fixed rate, the counterparty would be required to make payments to Plaintiff. *Id.* (Thus, Plaintiff would assume the risk of falling interest rates, but would be protected from rising interest rates.) Plaintiff agreed to implement the hedge. *Id.* ¶ 15.

Accordingly, the Financial Defendants brokered a swap agreement on Plaintiff's behalf in October 2001 with Lehman Brothers Special Financing, Inc. ("Lehman Financing"), a wholly owned subsidiary of Lehman Brothers Holdings, Inc. ("Lehman Holding Co."). *Id.* ¶ 17. On October 25, 2001, Plaintiff and Lehman Financing executed the swap agreement. *See* ISDA Master Agreement ("Swap Agreement"), *attached as* Compl. Ex. A.

The swap agreement had a seven year term — from November 2001 through November 2008. *Id.* But, section 5 of the swap agreement provides that a party's bankruptcy constitutes an "Event of Default." Swap Agreement § 5(a)(vii). Section 6 provides that if a party defaults, the other party may invoke "an Early Termination Date in respect of all outstanding Transactions." *Id.* § 6(a).

Crucially, however, to invoke the early termination provision, notice must be given to the defaulting party. *Id.* Section 10 provides the acceptable ways that notice may be transmitted, specifying: "Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system)." *Id.* § 10(a).

Section 11 provides the parties' choice-of-law, explaining that the agreement will be "governed by and construed in accordance with the law specified in the Schedule," *id.* § 11(a), which selects "the laws of the state of New York, without reference to choice of law doctrine." *See* Swap Agreement Ex. B.

**B**

Lehman Holding Co. sought Chapter 11 bankruptcy protection on September 15, 2008. Compl. ¶ 20. Lehman Financing was not a part of that bankruptcy filing (it would file its own Chapter 11 petition on October 3, 2008).

On September 29, 2008, Mr. George composed an email discussing the potential consequences of the bankruptcy on parties like Plaintiff. Legal Defs.' Countercl. ¶ 6, ECF No. 20. He first noted that Lehman Financing was not a party to the Lehman Holding Co. bankruptcy proceedings. *Id.* But, he observed, "under most (if not all) swaps that have [Lehman] Financing as the counterparty, [Lehman Holding Co.] has issued a guaranty on the

-4-

swap payments due from [Lehman] Financing.  Under Section 5(a)(vii) of the Agreement, the filing of bankruptcy by a Credit Support Provider or Specified Entity constitutes an Event of Default."  *Id*.  Given the default, Mr. George concluded, the swap agreement could be unwound.  *Id*.  Explaining how to do so, he wrote:

> [T]he borrower will need to calculate the Settlement Amount — yes, it is the non-defaulting party (the borrower) that establishes this amount. All swaps that I have reviewed state that the Second Method and Market Quotation is the means to establish the Settlement Amount.  Under Market Quotation, the Settlement Amount is determined on the basis of quotations from Reference Market Makers. Under this methodology, the borrower should request bids from 4 leading dealers in the market on what they would pay to assume Special Financing's position in the swap.  Then the borrower will review the responses — if 4 responses are provided, the arithmetic mean of the quotations will be the Settlement Amount — if only 3 responses are received the middle response will be the Settlement Amount.  If however, fewer than 3 response[s] are received, it is determined that the Settlement Amount using the Market Quotation method can not be determined and the Loss methodology should be used.  Under the Loss procedures, the borrower should determine the amount that Special Financing's total losses will be from terminating the swap.

*Id*.  Mr. George went on to explain that he had discussed what the potential market for assuming Lehman Financing's position in the swap might be with several "swap advisors."  *Id*.  He wrote:

> The swap advisors are predicting that the borrower will not get 3 bids.  If there are less than 3 bids, the borrower will use the Loss method and take whatever bid they did receive.  We are also being told that any bids that do come back will most likely have $0 as the upfront payment — therefore, $0 will be the Settlement Amount (if by chance you do receive an upfront payment, this payment will be the Settlement Amount due [Lehman]  Financing).  The other way to think about this is that if [Lehman] Financing wanted to sell its position on the swap, there most likely would not be a market to buy that position, therefore [Lehman] Financing has not suffered any losses in connection with the termination.  The next question is what happens if there are no responses.  At this point, the borrower has determined that there is not a market for such a swap and the Settlement Amount would still be $0.  The borrowers do need to be careful here and not enter into another swap for a reasonable time.  If they did, [Lehman] Financing could have an argument that the determination of the Settlement Amount was not handled properly.  There was no consensus of what time period this should be; however most agreed that 2–3 weeks seemed reasonable or the occurrence of some dramatic event which would affect the market and cause the

-5-

swap market place to be different than at the time the Settlement Amount was determined.

*Id*. (emphasis omitted).   Finally, Mr. George noted that if Lehman Financing itself filed for bankruptcy, a new set of rules would apply: "Section 562 of the Bankruptcy Code will kick in and the bankruptcy court will determine the termination payment due on the earliest subsequent date on which there are commercially reasonable determinates — you will not be permitted to use the Market Quotation or the Loss method."  *Id*. (emphasis omitted).

On September 30, 2008, Mr. George forwarded his email to Kassem Matt at Lancaster Pollard.  *Id*.  Mr. George did not intend that Mr. Matt share its contents with anyone else.  *Id*. ¶ 7.

That day, Lancaster Pollard contacted Plaintiff regarding Lehman Holding Co.'s Chapter 11 filing.  Compl. ¶ 22.  To address the issue, the Financial Defendants attached a proposed letter from Plaintiff to Lehman Financing.  *Id*. ¶ 24.   The letter notified Lehman that because of Lehman Holding Co.'s Chapter 11 filing Plaintiff was withholding future payments due under the agreement.  *Id*. ¶ 24.  The Financial Defendants advised Plaintiff to "sign and fax to Lehman Brothers as soon as possible regarding putting them on notice of the default and the nonpayment of your October 1 payment."  *Id*. ¶ 22 (brackets omitted).  Plaintiff did so.  *Id*. ¶ 23.

On October 3, 2008, Lehman Financing filed for Chapter 11 bankruptcy.  Legal Defs.' Countercl. ¶ 10.  The Financial Defendants, however, did not inform Plaintiff of Mr. George's instruction that if Lehman Financing filed for bankruptcy protection, neither the market quotation nor the loss method could be used.  *Id*. ¶ 12.  Moreover, the documents that the Financial Defendants provided to Plaintiff used the market quotation and loss method to calculate the termination payment.  *Id*. ¶ 13.

On October 9, 2008, the Financial Defendants requested that Plaintiff authorize the termination of the swap agreement.  Compl. ¶ 25.  Plaintiff did so.  *Id*.  The following week,

Plaintiff received "a second letter to be addressed to Lehman [Finacial] on [Plaintiff's] letterhead. . . . [Plaintiff] was instructed to send the communication by facsimile." *Id.* ¶ 26. Again, Plaintiff did so. *Id.*

On October 16, 2008, Plaintiff "faxed a request for early termination to Lehman [Financing] at fax number 646-758-2988." Legal Defs.' Countercl. ¶ 19. Using the market quotation and loss method, Plaintiff then determined the swap agreement's settlement amount to be $0. *Id.* ¶¶ 21–22. On October 20, 2008, Plaintiff faxed Lehman Financing a notice of termination of the swap agreement. *Id.* ¶ 20. The notice informed Lehman of Plaintiff's settlement amount calculations and that the settlement amount was $0. *Id.*

Plaintiff then paid the Financial Defendants $2,000 invoiced amount for "legal fees." Compl. ¶ 95.

### D

In November 2008, Plaintiff hired Robert Schwartz, a partner at Butzel Long, to broker a second bond interest rate swap agreement for Plaintiff. Legal Defs.' Countercl. ¶ 24. He did so, and Plaintiff entered into a swap agreement with Charter One. *Id.* The Legal Defendants had no involvement with this transaction. *Id.* ¶ 26.

Several months passed. In May 2009, Lehman Financing sent Plaintiff monthly invoices for money owed by Plaintiff to Lehman Financing from November 2008 through May 2009. *Id.* ¶ 35.

In September 2009, Lehman Financing notified Plaintiff that Plaintiff "had not successfully terminated its swap agreement." *Id.* ¶ 38. Plaintiff contacted Mr. Schwartz. *Id.* ¶ 41. (Plaintiff did not contact the Legal Defendants. *Id.* ¶ 40.) Mr. Schwartz responded:

> Lehman most certainly seems to want to renegotiate, at least. They appear to be taking the position that your termination was not timely, so they have rights to

renegotiate or enforce the terms of the swap. I wasn't involved in the termination of the swap, nor do I know when you terminated it, so I can't offer much in the way of advice. Based on the Lehman letter, it appears that there may have been grounds for terminating at or before the Lehman bankruptcy, so timing could be important there. However, the terms of the swap control, so whatever the termination provisions set forth as grounds for termination of the swap, and the timing of it, are most important. I am not at all familiar with bankruptcy matters, so I can't respond to the letter's representations about what rights Lehman may have. In this regard, only a bankruptcy lawyer can give the appropriate advice. On the whole, someone should review the terms of the swap regarding your termination, and the basis for the termination. Then, compare the conclusions with the assertions of Lehman. That may or may not lead to the need for an analysis of the situation under the bankruptcy laws, although, before reaching a final conclusion you should consider having a bankruptcy lawyer look at Lehman's claims in that regard. This is no small matter and ultimately could be very expensive to you if Lehman is right.

*Id.* ¶ 42.

## E

About this time, the court presiding over the Lehman bankruptcy proceedings entered an order requiring "those parties who were subject to claims of Lehman to enter into a non-binding mediation of such disputes prior to adjudicating the merits in the Bankruptcy Court." Compl. ¶ 37. Plaintiff did so. *Id.* ¶¶ 37–40.

Plaintiff also consulted the Financial Defendants regarding Lehman's assertions. *Id.* ¶ 32. In October 2009, The Financial Defendants informed Plaintiff "that fax was an appropriate method of delivery of termination of the Swap Agreement and that [Plaintiff] 'followed the language articulated in the swap document for termination.'" *Id.*

On October 5, 2009, Plaintiff was notified by Lehman Financial that it "had no record of receipt of the faxed termination notices." Legal Defs.' Countercl. ¶ 53. That day, Ms. Hahn emailed Plaintiff recommending that it "hold tight" to its position. *Id.* ¶ 54. "Another organization I am working with," Ms. Hahn wrote, "has hired bankruptcy counsel and their swap documents are very similar to yours and that attorney still says they have a right to terminate it

even now since they chose to not pull the trigger last fall. At the end of the day it is your call on what you want to do, our recommendation is to hold tight and respond with the copies of documents you sent them last fall to terminate the swap." *Id.*

Two months later, Ms. Hahn suggested a change in course — recommending Plaintiff retain bankruptcy counsel. Legal Defs.' Countercl. ¶ 62. In an email to Plaintiff on December 8, 2009, Ms. Hahn first explained that the Financial Defendants "still stand by the actions we recommended you take." *Id.* But, she continued, Plaintiff may nevertheless wish to consult a bankruptcy law expert, explaining:

> Given the increasing communication some of our clients are getting from Lehman about the swaps we terminated, I have secured names and contact information for two attorneys here in Columbus who are bankruptcy specialists with healthcare experience who may be able to assist you in further discussion with Lehman if you so desire. The legal counsel we employed for the swaps are bond counsel not bankruptcy specialists and we thought it prudent to help our clients have higher level experts available if the need arises. We still stand by the actions we recommended you take, I just wanted to provide additional assistance if it comes to that. The attorneys are: Victoria Powers . . . and Tyson Crist at [Schottenstein Zox & Dunn].

*Id.* Plaintiff responded that it was "inclined to check with the attorneys you are suggesting, but not sure it is really necessary at this point unless they step up the efforts." *Id.* ¶63.

Two weeks later, Plaintiff contacted the attorneys that Ms. Hahn had recommended and discussed the Lehman swap default. *Id.* ¶¶ 66–68. In 2011, Plaintiff executed a formal engagement letter with Schottenstein Zox & Dunn for that firm to represent Plaintiff with respect to Lehman's claims against Plaintiff. *Id.* ¶ 71.

Sometime later, Plaintiff entered into a settlement agreement (termed a "termination agreement") with Lehman "settling all claims of Lehman in exchange for payment." Compl. ¶ 39. This litigation ensued.

**F**

In February 2012, Plaintiff filed a seven-count complaint in the Huron County Circuit Court against the Legal and Financial Defendants.

Defendants were served in March 2012.  The following month, Defendants removed the case to this Court based on diversity of citizenship.  ECF No. 1.

On April 12, 2012, the Financial Defendants filed a cross-claim for indemnification against the Legal Defendants.  ECF No. 3.  If the Financial Defendants are liable to Plaintiff, the cross-claim asserts, the Legal Defendants are liable to the Financial Defendants.

The Legal Defendants, in turn, moved to dismiss Plaintiff's complaint and the Financial Defendants' cross-claim.  ECF Nos. 5, 6.  In July, the Court denied the motion to dismiss the complaint and denied in part and granted in part the motion to dismiss the complaint.  *Scheurer Hosp. v. Lancaster Pollard & Co.*, 12-11536, 2012 WL 3065347 (E.D. Mich. July 27, 2012).

The Legal Defendants then answered, counterclaimed against Plaintiff, and cross-claimed against the Financial Defendants.  ECF Nos. 21–22.

The counterclaim against Plaintiff has three counts.  Each seeks declaratory relief.  Count one seeks a declaration that Plaintiff's "termination agreement" with Lehman "is unreasonable, unconscionable and unenforceable."  Legal Defs.' Countercl. ¶ 80.  Count two seeks a declaration that Plaintiff did not have an attorney-client relationship with the Legal Defendants.  And count three seeks a declaration that Plaintiff's claims against the Legal Defendants are barred by the statute of limitations.

The Legal Defendants' cross-claim has two counts.  Count one seeks compensatory damages from the Financial Defendants for violating the Ohio Deceptive Trade Practices Act,

Ohio Rev. Code § 4165.02.  Count two seeks a declaration that the Financial Defendants' cross-claim against the Legal Defendants is barred by the statute of limitations.

Plaintiff now moves to dismiss the first two counts of the counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) and to redesignate the third count (the statute of limitations count) as an affirmative defense.  ECF Nos. 27.  The Financial Defendants move to dismiss the first count of the cross-claim pursuant to the same rule and to redesignate the second count (again, a statute of limitations count) as an affirmative defense.  ECF No. 23.  Each motion is addressed in turn.

## II

To survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility," the Supreme Court instructs, "when the [party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555–56).  A court must accept all factual content in the pleading as true, however, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. . . .  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.

**III**

The Legal Defendants' counterclaim against Plaintiff, as noted, has three counts.  Each seeks declaratory relief.

"In a case of actual controversy within its jurisdiction," the Declaratory Judgment Act provides, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.

Neither a sword nor a shield, the Declaratory Judgment Act does not create an independent cause of action, but merely offers another form of relief.  *Heydon v. MediaOne of Se.Mich., Inc.*, 327 F.3d 466, 470 (6th Cir. 2003) (citing *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 241 (1952); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950); and *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)).  "Therefore, a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief."  *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993).

Whether to grant such relief rests within the discretion of the district court.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  The Supreme Court emphasizes that the Declaratory Judgment Act vests district courts with "unique and substantial discretion."  *Id.* at 288.  Although substantial, the district court's discretion is also circumscribed:

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.  It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed.

*Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (quoting Edwin

Borchard, *Declaratory Judgments* 299 (2d ed.1941)).   Extrapolating from these two basic

criteria, the Sixth Circuit instructs that a district court should consider five factors:

    (1)    whether the declaratory action would settle the controversy;
    (2)    whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
    (3)    whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";
    (4)    whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
    (5)    whether there is an alternative remedy which is better or more effective.

*Grand Trunk*, 746 F.2d at 326 (formatting supplied) (quoting 6A *Moore's Federal Practice* ¶

57.08(2) (1983)).

## A

Count one of the Legal Defendants' counterclaim seeks a declaration that the termination

agreement that Plaintiff and Lehman executed "is unreasonable, unconscionable and

unenforceable."   Legal Defs.' Countercl. ¶ 80.   Specifically, it asserts that the termination

agreement is so because it "provides that [Plaintiff] had no expectation that Lehman would

provide material information relating to Lehman's claims against [Plaintiff] and that [Plaintiff]

consented to a settlement agreement with Lehman even though Lehman may have knowingly

engaged in material misrepresentations and omissions."   *Id.*   Plaintiff moves to dismiss this count

for three reasons.   None are persuasive.

## 1

First, Plaintiff argues that the count is premature because the Legal Defendants do not

know what the terms of the termination agreement are.   Plaintiff writes: "Defendants have

speculated as to the terms of the termination agreement and the production of the termination agreement is still a contentious discovery issue between the parties." Pl.'s Mot. to Dismiss 9.

Plaintiff is not, however, asserting that the Legal Defendants are incorrect about the terms of the termination agreement.  Rather, Plaintiff is asserting that the Legal Defendants are just guessing about what those terms are.  (Put differently, Plaintiff is not saying that the Legal Defendants are wrong; Plaintiff is saying that the Legal Defendants cannot know that they are right.)  Plaintiff's argument, however, has been overcome by events.

Plaintiff filed its motion to dismiss the counterclaim on September 7, 2012.  At the time, production of the termination agreement was a contentious discovery issue (it was the subject of a motion to compel).  Since then, however, Plaintiff has agreed to produce a copy of the termination agreement for the Legal Defendants.  On November 9, 2012, this understanding was memorialized in an order issued by Magistrate Judge Charles Binder.  *See* ECF No 66.  And, although the termination agreement has been produced, Plaintiff has not sought to supplement its papers to argue that the Legal Defendants are wrong about the terms of the termination agreement.  Plaintiff's argument that the count should be dismissed because the Legal Defendants are simply guessing about the terms of termination agreement is unpersuasive.  The Legal Defendants are not guessing anymore.

**2**

Next, Plaintiff argues that allegations in the counterclaim regarding whether Lehman received the faxed notices of termination "are not factually true."  Pl.'s Mot. to Dismiss 9. Plaintiff elaborates that it "has never been provided any confirmation from an entity involved in this litigation that Lehman Brothers actually received the faxed termination notices."  *Id*. (citing Compl. ¶¶ 23, 30, 31, 38).

Contrary to Plaintiff's contention, on a motion to dismiss a counterclaim pursuant to Rule 12(b)(6) a court may not determine whether the counterclaim's allegations are "factually true." Rather, "All the relevant statements of fact contained in the counterclaim must be accepted as true." *Milton Roy Co. v. Bausch & Lomb Inc.*, 418 F. Supp. 975, 978 (D. Del. 1976) (citing *Hosp. Bldgs. Co. v. Rex Hosp.*, 425 U.S. 738 (1976)); *see also Carpenter Paper Co. v. Calcasieu Paper Co.*, 164 F.2d 653, 656 (5th Cir. 1947).

**3**

Additionally, Plaintiff argues that even if the Court accepts the allegations in the counterclaim as true, count one must nevertheless be dismissed because the alleged misrepresentations by Lehman were not material.  Pl.'s Mot. to Dismiss 9–10.  Plaintiff explains:

> Defendants have plead that Lehman Brothers received notice of the termination agreement by way of the faxes sent by Scheurer.  As stated above, Scheurer has no reason to believe this to be true and even if true, if Lehman Brothers misrepresented in settlement negotiations that it did not receive the termination notice, it is not a material misrepresentation that would render the contract unenforceable because in some instances New York law requires strict compliance with the terms of the contract.

*Id*. at 10.   Thus, Plaintiff tacitly acknowledges that if Lehman had made any material misrepresentations, the termination agreement would be unenforceable.   Instead, Plaintiff counters that Lehman did not make any material misrepresentations since "in some instances New York law requires strict compliance with the terms of the contract."  *Id*.

Once again, Plaintiff misconstrues the Rule 12(b)(6) standard.   "Like a battlefield surgeon sorting the hopeful from the hopeless, a motion to dismiss invokes a form of legal triage, a paring of viable claims from those doomed by law."  *Iacampo v. Hasbro, Inc.*, 929 F. Supp. 562, 567 (D.R.I. 1996).  "It is the moving party which has the burden of proving that no claim exists."  *Lebron v. Ashford Presbyterian Cmty. Hosp.*, 995 F. Supp. 241, 243 (D.P.R. 1998); *see*

*generally* Arthur Miller, *From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure*, 60 Duke L.J. 1, 19–20 (2010) ("[W]hereas *Conley* accepted complaints showing the possibility of a right to relief, *Twombly* requires a pleading to show the plausibility of a claim; the Court has not demanded that the pleader demonstrate a probability of the claim prevailing on the merits, however.").

Plaintiff contends that the count should be dismissed because Plaintiff could win "in some instances." Pl.'s Mot. to Dismiss 10. That is, Plaintiff neither asserts that it must win or that it is implausible that Defendant will win. Thus, Plaintiff does not attempt, much less demonstrate, that no claim plausibly exists.[1] Rather, Plaintiff merely asserts that it is plausible that Plaintiff could win as well. This, however, does not establish that count one of the counterclaim must be dismissed for not stating a claim on which relief may be granted.

**4**

Finally, as an aside, it should be noted that although Plaintiff does not advance a persuasive argument on its Rule 12(b)(6) motion, one might well be available on a Rule 56 motion. As a general matter, "The doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties." *NML Capital v. Republic of Argentina*, 621 F.3d 230, 237 (2d Cir. 2010) (quoting *United States v. Martinez*, 151 F.3d 68, 74 (2d Cir. 1998)). Thus, it generally does not apply to two sophisticated commercial parties, both represented by counsel, negotiating a settlement. *See id.*

---

[1] As this Court previously noted, New York law is not altogether uniform on whether actual notice is sufficient to terminate a contract. *Scheurer Hosp.*, 2012 WL 3065347, at *11 (collecting cases). Plaintiff does not attempt to distinguish the line of cases holding that strict compliance with the terms of the contract is not required. *E.g.*, *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers*, 706 F. Supp. 2d 350, 360 (S.D.N.Y. 2009) ("Under New York law, timely notice that violates the terms of the contract is proper so long as it is actually received and no prejudice results.").

In New York,[2] "unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made — i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988) (quotation marks omitted) (quoting *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965)).[3]

"The procedural element of unconscionability," the New York Court of Appeals explains, "requires an examination of the contract formation process and the alleged lack of meaningful choice." *Gillman*, 534 N.E.2d at 828. The court elaborates: "The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Id.*

Here, the parties to the termination agreement, Plaintiff and Lehman Financial, have not asserted that they lacked meaningful choice about whether to enter the agreement. As noted, moreover, they were both sophisticated parties represented by counsel. *See generally NML Capital*, 621 F.3d at 238 ("[The defendant] has pointed to no authority — and we are aware of none — finding an agreement involving parties of like sophistication unenforceable on substantive unconscionability grounds.").

---

[2] Although not expressly identified by the parties, it is likely that the termination agreement — like the swap agreement — contains a choice-of-law provision selecting New York law. *See e.g., Stinger v. Chase Bank USA, NA,* 265 F. App'x 224 (5th Cir.2 008) (applying law of state identified in choice-of-law provision to determine unconscionability of arbitration provision). If no choice of law provision was included, New York law would nevertheless apply. *See Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 703 (Mich. 1995) (citing Restatement (Second) of Contracts §§ 187 and 188 (1971)).

[3] Additionally, the New York Court of Appeals observes, "there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman*, 534 N.E.2d at 829 (collecting cases).

Under the circumstances, the Legal Defendants will face substantial obstacles in attempting to establish unconscionability.  But because of the fact-intensive nature of this inquiry, this is a question better resolved on a summary judgment motion than on a motion to dismiss for failure to state a claim.  Perhaps recognizing this, Plaintiff does not make this argument in its motion to dismiss.  And based on the arguments that it does make, Plaintiff is not entitled to have count one of the counterclaim dismissed for not stating a claim on which relief may be granted.

Plaintiff's motion to dismiss count one of the counterclaim will be denied.

**B**

Count two of the counterclaim seeks a declaration that Plaintiff did not have an attorney-client relationship with the Legal Defendants.  Moving to dismiss this count, Plaintiff acknowledges that this Court found in its previous opinion and order "that [Plaintiff] did not have an attorney-client relationship with [the Legal] Defendants but that it may proceed under a third-party beneficiary claim of legal malpractice."  Pl.'s Reply Br. 4; *see Scheurer Hosp.*, 2012 WL 3065347, at *10.  But, Plaintiff continues, this Court's previous opinion moots the issue. Plaintiff writes: "If this Court declares, duplicatively, that no attorney-client relationship existed between [Plaintiff] and [the Legal] Defendants, it does not affect [Plaintiff's] third-party beneficiary malpractice claim and it does not clarify the legal relations at issue to any detail beyond what the Court has already determined."  Pl.'s Reply Br. 4.

Plaintiff is correct that one of the factors that a court should consider in evaluating whether to authorize declaratory relief is "whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue."  *Grand Trunk*, 746 F.2d at 326.  And Plaintiff is also correct that this Court has previously found that "an attorney-client relationship existed

between the Legal Defendants and the Financial Defendants — not between the Legal Defendants and Plaintiff." *Scheurer Hosp.*, 2012 WL 3065347, at *9. But what Plaintiff does not mention is that Plaintiff itself injected the attorney-client issue into the case. Pl.'s Compl. ¶¶ 89–102. Count six of the complaint expressly alleges that the Legal Defendants and Plaintiff had an attorney-client relationship. *See id.* Given that Plaintiff has not voluntarily dismissed this count, the Legal Defendants are entitled to seek a declaration that would settle the particular dispute by clarifying the legal relations at issue. *See Grand Trunk*, 746 F.2d at 326.

Plaintiff's motion to dismiss count two of the counterclaim will be denied.

## C

Count three of the counterclaim seeks a declaration that Plaintiff's claims against the Legal Defendants are barred by the statute of limitations. Plaintiff asserts that the Court should redesignate this count as an affirmative defense rather than a counterclaim. Plaintiff is correct.

## 1

The statute of limitations has long been an affirmative defense. *See generally* Fleming James, Jr. & Geoffrey Hazard, *Civil Procedure* 252 (5th ed. 2001) (discussing history of statute of limitations). The Federal Rules of Civil Procedure codify of the common law rule. "In responding to a pleading," Rule 8 specifies, "a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations." Fed. R. Civ. P. 8(c)(1).

Rule 8 further provides: "If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so." Fed. R. Civ. P. 8(c)(2).

A pragmatic rule, the purpose of Rule 8(c)(2) is to elevate substance over artful pleading. As Judge Frank Easterbrook puts the point, "The label 'counterclaim' has no magic. What is

really an answer or defense to a suit does not become an independent piece of litigation because of its label." *Tenneco Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375, 1379 (7th Cir. 1985) (collecting cases); *see also Rayman v. Peoples Sav. Corp.*, 735 F. Supp. 842, 852 (N.D. Ill. 1990) (disregarding counterclaim because it "simply duplicates arguments made by way of affirmative defense").

The distinction between counterclaims and affirmative defenses, James and Hazard observe, is that the former seeks relief independent of that sought in the complaint while the latter simply challenges the relief sought in the complaint, cautioning:

> [T]he question whether a set of facts is properly a counterclaim or merely a defense is not always an easy one to answer. When the defendant is asking for an affirmative award of money damages rather than simply a reduction of plaintiff's claim, defendant's pleading should be regarded as a counterclaim. But many kinds of relief, though affirmative in form, are in result nothing more than defenses to plaintiff's claim.

James & Hazard, *supra*, at 255 (footnote omitted); see generally 6 Arthur Miller et al., *Federal Practice & Procedure* § 1406 (West 2010) (discussing counterclaims and cross-claims for declaratory judgment).

Here, the Legal Defendants' plead the statute of limitations as both an affirmative defense and a counterclaim. The former is properly pleaded; the latter is not. The statute of limitations challenges the relief sought in the complaint. If successful, it will do nothing more than reduce Plaintiff's claim (to nothing). It is an affirmative defense, not an independent cause of action.

Plaintiff's motion to dismiss count three of the counterclaim will be granted.

### 2

Complicating — but not altering — this conclusion is the specific type of relief sought by the Legal Defendants in count three of their counterclaim: declaratory relief.

Had the Legal Defendants been the party to have initiated the case in this Court (rather than Plaintiff), for example, declaratory relief on the statute of limitations question may have been appropriate. *Cf. In re United Ins. Mgmt., Inc.*, 14 F.3d 1380, 1384 (9th Cir. 1994) (permitting declaratory judgment action on whether equitable tolling exception to two-year statute of limitations in § 546(a)(1) of the Bankruptcy Code applied). That, however, is not the procedural posture of this case.

The Declaratory Judgment Act, as noted, vests district courts with "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co*., 515 U.S. 277, 286 (1995). Factors to consider include:

(1)    whether the declaratory action would settle the controversy;
(2)    whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue;
(3)    whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";
(4)    whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and
(5)    whether there is an alternative remedy which is better or more effective.

*Grand Trunk*, 746 F.2d at 326 (formatting supplied) (quoting 6A *Moore's Federal Practice* ¶ 57.08(2) (1983)).

Here, none of the factors suggest that resolving the statute of limitations question is better decided on declaratory judgment than as an affirmative defense. First, while a declaratory action would settle the controversy between Plaintiff and the Legal Defendants, such an action is also unnecessarily duplicative. The Legal Defendants claim to have a valid statute of limitations defense to Plaintiff's claims, which they have raised as an affirmative defense. A separate declaratory action on the same issue is, of course, redundant. Second, such a redundant action would not serve a useful purpose in clarifying the legal relations in issue. The alternative

remedy — moving for judgment as a matter of law on Plaintiff's claims based on the statute of limitations defense — is equally effective. Given that the statute of limitations is specifically identified as an affirmative defense, not an independent action, it is the better practice.

Consequently, the Court declines to authorize the Legal Defendants to seek declaratory relief on their statute of limitations defense. Therefore, as noted, Plaintiff's motion to dismiss count three of the counterclaim will be granted.

### D

Finally, the counterclaim's prayer for relief seeks attorney fees and costs. Moving to dismiss this claim for relief, Plaintiff writes: "Defendants have provided no statutory, contractual, or equitable basis for recovery of costs and attorneys' fees." Pl.'s Mot. to Dismiss 14. Plaintiff's argument lacks merit.

Federal Rule of Civil Procedure 54(d)(1) provides that as a general matter "costs — other than attorney's fees — should be allowed to the prevailing party." Here, if the Legal Defendants prevail on the merits, they will be entitled to costs.

Attorney fees, in contrast, are generally not available to the prevailing party, unless they are specifically provided for by either statute or contract. *See generally Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247–60 (1975) (discussing historical development of the "American rule"). Nevertheless, courts retain the inherent authority to "assess attorneys' fees for the willful disobedience of a court order as part of the fine to be levied on the defendant, or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 258–59 (alterations, quotation marks, and citations omitted) (collecting cases). Here, if Plaintiff misbehaves in any of these ways, the Legal Defendants may be entitled to attorney fees. At this

early stage in the litigation, it is premature to categorically bar the Legal Defendants from recovering attorney fees.

Plaintiff's motion to dismiss the Legal Defendants' claim for attorney fees will be denied.

## IV

The Legal Defendants' cross-claim against the Financial Defendants has two counts. Count one alleges that the Financial Defendants violated the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02. Count two seeks a declaration that the Financial Defendants' cross-claim against the Legal Defendants is barred by the statute of limitations.

## A

Count one of the Legal Defendants' cross-claim alleges that the Financial Defendants made several misrepresentations, violating section 4165.02 of the Ohio Revised Code.[4] First, the Financial Defendants misrepresented "to [Plaintiff] that [the Financial Defendants] were receiving legal services from [the Legal] Defendants related to the creation of, interpretation of, and/or termination of the Swap Agreement." Legal Defs.' Cross-cl. ¶ 86. Second, the Financial Defendants misrepresented "to [Plaintiff] that the method to calculate the termination value of [Plaintiff's] Swap Agreement with Lehman was devised by [the Legal Defendants]." *Id*. ¶ 93. And finally, the Financial Defendants misrepresented to Plaintiff that they "had incurred legal

---

[4] In pertinent part, § 4165.02 provides:

(A) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another.

Ohio Rev. Code § 4165.02(A)(1)–(3).

fees from [the Legal] Defendants related to the termination of [Plaintiff's] Swap Agreement." *Id.* ¶ 90. These misrepresentations, the Legal Defendants assert, "have caused damages to Defendants in that Defendants have incurred legal fees and related expenses as a result of defending this lawsuit." *Id.* ¶ 102.

The Financial Defendants move to dismiss the Legal Defendants' Deceptive Trade Practices Act claim on two grounds. First, the Ohio state law "has no application to conduct occurring within the State of Michigan." And second, the act does not "permit one defendant to recover its defense costs from another defendant." Each argument is addressed in turn.

## 1

A federal court sitting in diversity applies the choice-of-law rules of the state in which the court sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). Here, that state is Michigan.

To decide choice-of-law issues, Michigan applies the lex fori rule. *Burney v. PV Holding Corp.*, 553 N.W.2d 657, 659 (Mich. Ct. App. 1996). This rule provides that "the law of the forum state (lex fori) should apply unless there is a 'rational reason' to displace it." *Id.*; *see also Mahne v. Ford Motor Co.*, 900 F.2d 83, 86 (6th Cir. 1990) (noting that Michigan now applies lex fori rule); *see generally* Eugene Scoles et al., *Conflict of Laws* § 17.12 (hornbook ed. 2004) (discussing lex fori rule).

"In determining whether a rational reason to displace Michigan law exists," the Michigan Supreme Court explains, "we undertake a two-step analysis. First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that

Michigan law be applied, despite the foreign interests." *Sutherland v. Kennington Truck Serv., Ltd*, 562 N.W.2d 466 (Mich. 1997) (citing *Olmstead v. Anderson*, 400 N.W.2d 292 (Mich. 1987)).  Although this analysis "most frequently favors the forum (Michigan's) law, Michigan courts nonetheless use another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter." *Hall v. Gen. Motors, Corp.*, 582 N.W.2d 866, 868 (Mich. Ct. App. 1998).  This is such a case.

Both the alleged violators of the Deceptive Trade Practices Act (the Financial Defendants) and the alleged victims (the Legal Defendants) are domiciled in Ohio.  Lancaster Pollard is an Ohio corporation with its principal place of business in that state.  Ms. Hahn works in Lancaster Pollard's Ohio office.  Peck Shaffer is a law firm based in Ohio.  And Mr. George is an attorney licensed to practice in Ohio.

Not only are the relevant parties each citizens of Ohio, the relevant conduct centers on Ohio as well.  The alleged tortious conduct — the Financial Defendants' misrepresentations — originated in Ohio.  And, though the misrepresentations travelled to Michigan, this was but a waystop on their way back to Ohio, where their impact was felt by the Legal Defendants.

Under the circumstances, Ohio has a significant interest in having its law applied.  Michigan, in contrast, has only a minimal interest in whether one set of Ohio residents (the Legal Defendants) may bring a claim against another set of Ohio residents (the Financial Defendants) for misrepresentations that began and ended in Ohio.  The Financial Defendants' contention that the Ohio Deceptive Trade Practices Act does not apply lacks merit.

## 2

The Ohio Deceptive Trade Practices Act provides two distinct routes to court.  Ohio Rev. Code § 4165.03(A)–(B).  The first, which provides injunctive relief to those "likely to be

damaged," is available regardless of whether the person has proof of "monetary damage." §
4165.03(A)(1). The second, which provides monetary compensation to those who have been
"injured," requires proof of "actual damages." § 4165.03(A)(1). Once in court under either
route, the court "may" award attorney fees to the prevailing party. § 4165.03(B). In pertinent
part, the act provides:

> (A)(1)  A person who is likely to be damaged by a person who commits a
> deceptive trade practice that is listed in division (A) of section 4165.02 of
> the Revised Code may commence a civil action for injunctive relief
> against the other person, and the court of common pleas involved in that
> action may grant injunctive relief based on the principles of equity and on
> the terms that the court considers reasonable. Proof of monetary damage
> or loss of profits is not required in a civil action commenced under
> division (A)(1) of this section.
>
> (2)  A person who is injured by a person who commits a deceptive trade
> practice that is listed in division (A) of section 4165.02 of the Revised
> Code may commence a civil action to recover actual damages from the
> person who commits the deceptive trade practice.
>
> (B)  The court may award in accordance with this division reasonable
> attorney's fees to the prevailing party in either type of civil action
> authorized by division (A) of this section.

*Id.* § 4165.03(A)–(B). Subsections (A)(1) and (2) thus provide two different paths to court. And
once the court sees the matter through to conclusion, it "may" award attorney fees to the
prevailing party. The "may," however, indicates discretion. Under section 4165.03(B), "the
allowance of attorney fees is discretionary — not mandatory." *Cesare v. Work*, 520 N.E.2d 586,
591 (Ohio Ct. App. 1987) (citing *Lozier v. Kline*, 319 N.E.2d 204, 209 (Ohio Ct. App. 1973)).

Here, the Legal Defendants' claim relies on subsection (a)(2) — they seek money
damages, not an injunction. *See* Legal Defs.' Cross-cl. ¶ 102. But the only injury that they
allege is the "legal fees and related expenses as a result of defending this lawsuit." *Id.* Based on
the plain language of section 4165.03, this is not a route into court, but a discretionary form of

relief that may be awarded only after one party has prevailed in court. Because the Legal Defendants seek neither an injunction nor damages for an injury, they have not stated a claim under Ohio Deceptive Trade Practices Act.

Arguing against this conclusion, the Legal Defendants cite a number of Ohio cases holding that attorney fees may be recovered as compensatory damages when the fees were incurred in third-party litigation. The Legal Defendants' argument lacks merit.

"Where the wrongful act of the defendant has involved the plaintiff in litigation with others," the Ohio Court of Appeals observes, "such costs and expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful act and may be recovered as damages." *S & D Mech. Contractors, Inc. v. Enting Water Conditioning Sys., Inc.*, 593 N.E.2d 354, 363 (Ohio Ct. App. 1991) (quoting *V.N. Holderman & Sons. Co. v. Jackson*, 73 O.O.2d 148, 150. (Ohio Ct. Cl.1975)), *quoted in* Legal Defs.' Resp. Br. 12.

The key, however, is the "litigation with others." In *S & D Mechanical Contractors*, for example, the court emphasized that in Ohio "legal fees incurred in the third-party litigation . . . are thus recoverable as compensatory damages." 593 N.E.2d at 363; *see also Ironhead Marine, Inc. v. Donald C. Hannah Corp.*, 3:10 CV 82, 2012 WL 1202297, at *6 (N.D. Ohio Apr. 10, 2012) (noting that all of the cases relied on by the plaintiff "involves suits with third-parties").

Here, the only injury that the Legal Defendants' allege in their cross-claim is the "legal fees and related expenses as a result of defending this lawsuit." Legal Defs.' Cross-cl. ¶ 102. The cross-claim does not allege damages caused by "litigation with others." Consequently, the Legal Defendants have not stated a claim under Ohio Deceptive Trade Practices Act.

Against this conclusion, the Legal Defendants make one further argument, writing: "[The Financial Defendants'] deceptive trade practices have resulted in a number of entities, including

(but not limited to) [Plaintiff], suing [the Legal Defendants], even though [the Legal Defendants] did nothing wrong." Legal Defs.' Resp. Br. 12.

Contrary to the Legal Defendants' argument, however, their cross-claim does not seek to recover damages for the attorney fees incurred in third-party litigation. Rather, as noted, the only injury that the Legal Defendants' allege in their cross-claim is the "legal fees and related expenses as a result of defending *this* lawsuit." Legal Defs.' Cross-cl. ¶ 102 (emphasis supplied). This is not to suggest that the Legal Defendants cannot state a claim under Ohio Deceptive Trade Practices Act, only that their cross-claim does not do so at present. *See generally* Fed. R. Civ. P. 13(g).

Count one of the Legal Defendants' cross-claim will be dismissed.

**B**

Count two of the Legal Defendants' cross-claim seeks a declaration that the Financial Defendants' claims against the Legal Defendants are barred by the statute of limitations. As they did in answering Plaintiff's complaint, moreover, in responding to the Financial Defendants' cross-claim the Legal Defendants also raise the statute of limitations as an affirmative defense.

The Financial Defendants move to re-designate the count as an affirmative defense. For the same reasons discussed above, this affirmative defense will be re-designated as such.

**V**

Accordingly, it is **ORDERED** that Plaintiff's motion to dismiss (ECF No. 27) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Plaintiff's motion to dismiss counts one and two of the Legal Defendants' counterclaim, is **DENIED**.

It is further **ORDERED** that Plaintiff's motion to dismiss count three of the Legal Defendants' counterclaim and redesignate it as an affirmative defense is **GRANTED.**

It is further **ORDERED** that Plaintiff's motion to dismiss the Legal Defendants' request for attorney fees is **DENIED** without prejudice.

It is further **ORDERED** that the Financial Defendants' motion to dismiss cross-claim (ECF No. 23) is **GRANTED**.

Dated: January 16, 2013

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 16, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS